VAN R. HUMPHREY *et al.*, VS. PALMER E. HAVENS *et al.*

APPEAL FROM THE DISTRICT COURT OF RAMSEY COUNTY.

The time for bringing an appeal, or writ of error, dates from the entry of the order or judgment from which the same may be taken.

Where a motion for a new trial, founded on newly-discovered evidence, is denied, and an appeal is taken from the order denying the same, said appeal will not be dismissed on the ground that a previous appeal was taken from the judgment.

A writ of error will not lie, pending an appeal from the same judgment, but will be dismissed on motion.

In an action, to enforce an agreement of indemnity made by one person on behalf of another, where both principal and agent are made Defendants, the

Humphrey et al v. Havens et al.

authority of the agent was denied, and the Plaintiffs demanded the production of all correspondence between them. No correspondence was produced. The principal being examined as a witness, denied all knowledge of the transaction, and the agent being also examined, denied having informed the principal of the making of the agreement. After trial and judgment for the Defendants, the Plaintiffs discovered the existence of letters from the principal to the agent, touching the said agreement, and material to the issues tried; and having obtained the same from another of the Defendants, moved thereon for a new trial. *Held*, That the non-production of any correspondence in response to the notice, and the testimony of the parties thereto, misled the Plaintiffs, and they were not chargeable with negligence for failing to elicit the existence of these letters on cross-examination of the agent to whom the same were addressed.

Points and authorities of Appellants.

I.—The Court erred in excluding certain testimony offered by the Plaintiffs upon the trial, and also in receiving certain testimony offered by the Defendant Havens, under objections from the Plaintiffs' counsel.

First—The Court erred in excluding the testimony of J. P. Pond and A. M. Torbett, respecting the statements and declarations of Harriet E. Bishop (now Mrs. McConkey,) in relation to the purchase of the Kinney lots, and for whom the same were purchased, contained in folios 14 to 18, and folios 26 and 27, 34, 35 and 36 of "settled case."

In order to determine whether this testimony should have been received, it is necessary to understand what fact was sought to be established by it, and the effect of establishing such fact.

It was claimed by the Plaintiffs, and this testimony was to substantiate the claim, that the purchase of the eight Kinney lots was made for and on account of the Defendant Palmer E. Havens, by his duly authorized agent, Harriet E. Bishop. That he was the real principal in the transaction, (afterwards took and now holds the legal title to the lots, as is admitted,) and Miss Bishop merely his agent, and Pond and Torbett her advisers. That the real principal was, at the time of the sale, unknown to, and was purposely concealed from the seller Humphrey.

Now if this was really the case, Humphrey, upon discovering the principal, may go against him for his pay, as well as against

the age nt with whom he dealt. This is a familiar and well set-tled principle of law, which we do not suppose is contravened. 12 *Wend.*, 413 ; 3 *Hill,* 72 ; 12 *Barb.*, 27 ; 1 *Zabriskie, (N. J.,)* 659 ; 2 *Met.* 319 ; 29 *Maine*, 434 ; *Parson's Mercantile Law, p.* 148, *note* 5 ; 7 *Cush.*, 371 ; 8 *M. & W.*, 834.

Although the action may not be maintainable upon the note it-self, against Havens, he not being a party to it, yet it may be for the original consideration. 5 *Sandf.*, 101.

The agency or authority of Harriet E. Bishop to make pur-chases of real estate for Mr: Havens, and to procure the services of advisers, &c., is admitted. This authority was first conveyed by letter, which is attached to and made part of the complaint, as Exhibit " A."

The agency, and the legal effect resulting from the fact [sought to be established, being admitted, the question is, whether the proof offered was competent, as evidence to show that it was really a purchase for Havens. The . statement of the proposition seems to suggest the answer, so familiar is the principle of law governing it.

Mr. Greenleaf, in his work on evidence, vol. 1, sec. 113, says : " The principal constitutes the agent his representative in the transaction of certain business ; whatever, therefore, the agent does, in the lawful prosecution of that business, is the act of the principal, whom he represents. And where the acts of the agent will bind the principal, there, his representations, declarations and admissions, respecting the subject matter, will also bind him, if made at the same time, and constituting a part of the *res gestae.* They are of the nature of original evidence, and not of hearsay, the representation or statement of the agent, in such cases, being the ultimate fact to be proved, and not an admission of some other fact." *See also, Story on Agency, sec.* 134–137 ; *Cowen & Hill's Notes to Phillips' Evidence, Vol.* 2, *note* 182, *and cases cited.*

Second—The Court erred in receiving the testimony of Mrs. McConkey respecting the statements, declarations, conversations and wishes of J. P. Pond and A. M. Torbett ; and also that which related to the interest of others than herself and Havens in the

purchase of the Kinney lots and Dunville property, contained in folios 39 to 63 of " settled case," inclusive.

It is somewhat difficult to understand upon what principle this testimony of Mrs. McConkey was received, and that of Pond and Torbett rejected, relative to the conversations and understandings had between them.   The principle, however, which would render admissible the statements of Mrs. McConkey, (then Miss Bishop) as the agent of Havens, respecting the purchase of the Kinney lots, would have no application in rendering admissible the statements of Pond and Torbett upon the same subject.    It seems to us, therefore, that the Court rejected the competent, and received the incompetent testimony in this respect.    The testimony was also inadmissible under the rulings of this Court in *Sencerbox vs. McGrade*, 6 *Minn.*, 484.

Third—The Court erred in receiving in evidence the letter of Torbett to Havens, dated October 31st, 1859, commencing at folio 76 of " case ;" and the letter of Havens to Torbett, dated November 9th, 1859, commencing in folio 83 of " case ;" and the letter of Torbett to Havens, dated December 22d, 1859, commencing in folio 91 of " case ;" upon the ground that the same are irrelevant, immaterial and incompetent, and nothing but the statements and declarations of the writers thereof.   We are unable to comprehend upon what principle of the law of evidence these letters were admitted.   They amount to nothing but statements and declarations from Torbett to Havens and Havens to Torbett, made long after the events had transpired out of which this suit arose, and shortly before it was commenced.

Statements of a party made adverse to his claim in a suit, may be given in evidence against him by his adversary ; but who ever before heard of a party putting in evidence his own statements and declarations, on his own behalf, made long after the transaction out of which the controversy arose ?  If this letter of Havens' was admissible, any other letter he may have written to any other person, or anything he may have said, would be equally admissible.   It would be an easy and new way to make testimony.   It is

enough, to effectually dispose of this matter, to simply say the testimony was clearly incompetent.

Fourth—The Court erred in the admission of the *tenth* interrogatory addressed to the Defendant Havens, and his answers thereto, folios 118 to 121 of " case." The question is objectionable in all its parts. The first inquiry, as to whether he executed " the bond mentioned in the complaint, and a copy of which is thereto attached, marked " K," is wholly irrelevant and immaterial, because it is not alleged, or claimed, that he executed the same, except by his agent, Harriet E. Bishop. The next inquiry, whether he " ever authorized or empowered the said Harriet E. to execute the same for you or in your name," is asking for a legal conclusion upon admitted facts. Whether she had such original authority, depends upon the extent of the authority conferred by the letter marked Exhibit " A," attached to the complaint ; and this part of the question calls for his answer or opinion as to the extent of the authority there conferred. If it should be determined that such authority was not originally given, a question then arises, whether the course of dealings between Havens and his agent had been such as to authorize Torbett, to whom the bond " K " was given, to believe she had authority to execute the same in the name of Havens, her principal ; and the branch of the interrogatory in question calls, also, upon the witness to decide this matter by his answer. The further inquiry, as to " when and in what manner was said authority conferred," if at all, is wholly irrelevant and immaterial, as the pleadings admit the authority conferred by letter " A," attached to the complaint. The inquiry, " was or was not said bond made at your request, or with your knowledge or consent," is wholly immaterial and of no earthly consequence, if the agent was authorized to make it, or if Torbett had reason to believe she had such authority, or if it was afterwards ratified by Havens, all of which matters are to be determined by the law, as applicable to the facts that may be proved. The direction to the witness to " state when you first learned of the existence of such bond, and from whom and in what manner, and whether before or after October 2d, 1858," is wholly immate-

rial. The questions involved, are, did the agent, Miss Bishop, have authority to make the bond binding upon him, or did Torbett have legal reason to believe, from their course of doing business, that she had such authority, or did he afterward affirm, ratify or approve the act? When or from whom he heard it is of no consequence. The further direction for the witness to state, " whether you have ratified or repudiated the same, and when and in what manner," is asking for a legal conclusion. His judgment is wanted as to the legal effect of his acts. His statement is wanted that he wrote to Torbett repudiating the bond, and also his judgment that he never ratified it, although he holds the title and claims the land which was conveyed to him in consideration of the bond.

The answer to the interrogatory is more objectionable, if possible than the interrogatory itself. As a whole, it amounts to nothing but a legal conclusion of the witness. He arrogates to himself the determination of all the questions involved, and at once settles and disposes of the case. He decides the legal effect of all his acts, and determines that he never gave the authority claimed by his agent, and that Torbett had no legal right to suppose she had such authority, and that none of his acts amount to a ratification. He assumes the prerogative of the Court and decides the case, and the Court below allowed him to do it, and ratified his decision in the premises.

Fifth—The Court erred in admitting the twelfth interrogatory addressed to the Defendant Havens, and his answer thereto.

This question and answer was clearly irrelevant and immaterial, unless it was designed to elicit something to change, alter or modify the effect of " Exhibit " M," as affecting the liability of said Havens; and if such was the object, (as it most clearly was,) then it was manifestly incompetent, as attempting to change or modify a written instrument by parol proof. The object was to explain the trust clause in Exhibit " M," which is attached to the complaint. There is no ambiguity in it, latent or patent, and it is the business of the Court, from the language used, the subject matter and spirit of the instrument itself, and not by the aid of

oral testimony, to put upon it an interpretation. This principle is so familiar, and has been so often affirmed by this Court, that a citation of authorities is deemed superfluous.

Sixth—The Court erred, and it is the great error of the case, so far as relates to the rulings upon the admission of testimony, in excluding "Exhibit K," annexed to the complaint. If this was the bond or instrument of the Defendant Haven, it fixes his liability and determines the case; and whether it was or not, involves an inquiry as to the extent of the power originally conferred upon his agent, Miss Bishop, and as to what Torbett had a legal right to suppose was the extent of such power, from their previous mode of doing business, and also as to the effect of the subsequent course and acts of Havens upon the question of ratification.

In the case of *Carson & Eaton vs. Smith*, 5 *Minn. R.*, 78, this Court, adopting the language of the Court in *Leroy vs. Beard*, 8 *How. U. S. Sup. Ct. R.*, 466, held that the extent of a power conferred by a principal upon his agent, " is to be settled by the language employed in the whole instrument, aided by the situation of the parties and of the property, the usage of the country on such subjects, the acts of the parties themselves, and any other circumstances having a legal bearing, and throwing light on the question."

Mr. Wallace, in 1 *American Lead. Cases*, *p.* 546, says, upon this subject, that, " In all cases, an authority is to be construed, and the intention of the principal to be ascertained, in reference to the purpose of the appointment; and a consideration of the object which the agent is desired to accomplish, will either expand the powers specified as means of executing it, or limit the exercise of the most general powers conferred."

Looking then to the object of the agency, the authority conferred, and the extent of that authority, as interpreted by " the acts of the parties themselves," can there be any doubt of her power to bind him in the execution of Exhibit K? *See Parson on Con.*, 39; 4 *Cow.*, 645; 15 *East.*, 400; 17 *Ohio*, 466; 25 *N. Y*, 595, *and cases cited.*

As before remarked, if Havens is liable upon the agreement evidenced [by Exhibit K, then this suit may be maintained, and the relief asked for granted. *See* 9 *Paige*, 446 ; 10 *Paige*, 595 ; 2 *Barb.*, *S. C. R.*, 16 ; 2 *Sandf. Ch. R.*, 478 ; 2 *Denio*, 595.

But furthermore, the execution of Exhibit K., has been ratified by Havens again and again, by all his acts, and his whole course of action relative to the matter up to the present time. It was ratified in the execution of Exhibit M, attached to the complaint, in which he admits, under his hand and seal, that the Kinney lots were purchased for him by his agent, Harriet E. Bisbop, and is thereby estopped from denying her agency, or repudiating her acts in the premises. It will not do for him to say he did not know of Exhibit K. at the time he executed Exhibit M., for not only would it be contradicting the terms of the trust thereby created, but in thus adopting the conveyance of the property to himself, and assuming the ownership thereof, he is chargeable with notice of the consideration of the conveyance. He had the *means* of ascertaining the facts, and it is a rule of law, that if the principal possess the *means* of ascertaining the facts, and does not, he cannot deny the agency. 1 *Comstock*, 434 ; 21 *Barb.* 468 ; 13 *N. H.*, 145 ; 1 *Barb. Ch.* 287, *or* 687.

By Exhibit M, he creates an express trust to pay this very indebtedness, which, by Exhibit K, he is bound to pay—what stronger act of ratification than this is needed ?

But that which shows a ratification beyond all question, is the fact, that he received, accepted, and still holds and claims the fruits of the agency, viz.: the Kinney lots. This appears from the pleadings, from Exhibits H and M, attached to the complaint, from his own and all the testimony in the case, and the finding of the Court. The consideration of the conveyance of these Kinney lots to him, was Exhibit K. He accepts the conveyance, takes, holds and claims the property, but repudiates the consideration. He ratifies the act of his agent so far as it gives and secures to him property, but wants to repudiate the agreement of his agent to pay. Now the principle of law is well settled, that "if the principal accept, receive and hold the proceeds, or beneficial re-

42—vol. ix.

sults of a contract, he will be estopped from denying an original authority or ratification." "An adoption of the agency in part adopts it in the whole, because a principal is not permitted to accept and confirm so much of a contract made by one purporting to be his agent, as he shall think beneficial to himself, and reject the remainder." 1 *Parsons on Con.*, 46, 47. "The principal, by accepting a benefit accruing from the acts of the agent, is precluded from denying the agent's authority." 5 *Minn.*, 339. "A ratification of part of an unauthorized transaction of an agent, or one who assumes to act as such, is a confirmation of the whole." 1 *Coms.* 433; see also, 7 *East.* 164; 8 *Pick.* 56; 19 *Pick.* 300; 23 *Vermont*, 565; 13 *N. H.* 145; 21 *Conn.* 627; *Broom's Legal Maxims*, 676–7.

Here then we have the original authority conferred, in connection with the *object* of the agency—the extent of that authority, as interpreted "by the acts of the parties themselves"—the facts referred to showing that Torbett "had a right to infer" that the agent had the power to bind Havens to Exhibit K—and the ratification of the act by Havens, as evidenced by his receiving and holding the avails of the agency, and in creating a trust to pay this particular indebtedness. Clearly, then, we submit, the Court erred in excluding, as evidence, Exhibit K, and in finding that it was not binding upon Havens.

II.—The Court erred in the conclusions of law upon the facts as found.

*First*—As matter of fact the Court finds that the authority conferred upon Miss Bishop by Havens, to act for him, is embraced in Exhibit A, attached to the complaint, and is referred to, and made a part of the finding of facts. As conclusion of law, the Court finds that neither "Exhibit A, nor any act or declaration of said Havens," (though the Court does not find as facts, whether there were or were not other acts or declarations of Havens', bearing upon the matter,) "gave the said Harriet E. any authority to execute the instrument marked Exhibit K." In this legal conclusion we think the Court erred. Independent of the interpretation put upon that letter by the parties themselves, and by their

acts; and independent of what Torbett had a right to infer was the extent of her authority, from the previous course of dealing with him and others, (about which matter the Court is silent in the finding of facts,) we think the letter itself was sufficient to authorize her to purchase real estate for Havens on credit, and to bind him for the payment thereof, as per Exhibit K. This question is to be settled by considering "the language employed in the whole instrument;" "the *object* which the agent was desired to accomplish;" "the situation of the parties and of the property;" "the usages of the country on such subjects;" "and any other circumstances having a legal bearing, and throwing light on the question." This was one of the points we made and discussed, in attempting to demonstrate the error of the Court in excluding Exhibit K, as evidence; and we have only now to refer the Court to what we there said, and the authorities there cited.

*Second*—The Court finds as a fact, " That on or about said 14th October, 1857, the said Harriet E., in her own behalf, and assuming to act as the Attorney in fact for the said Havens, executed the instrument marked Exhibit K, in said complaint set forth, and herein referred to and made a part of this finding of facts. That said instrument was executed in consideration of the execution of the two conveyances marked Exhibits G and H aforesaid, and constituted the consideration to the said Torbett of the same." (Exhibits G and H are attached to the complaint, and are the conveyances by Torbett of the Kinney lots to Miss Bishop and Havens.) The Court finds as a further fact, "That said Havens still holds the title to the lots conveyed as aforesaid by said Exhibits G and H, and has never re-conveyed or offered to reconvey the same to the said Torbett, nor has he been requested so to do."— As a conclusion of law from these facts, the Court finds: "That the acceptance by the said Havens of the said deeds marked Exhibits G and H, and his retaining the title to the lots conveyed thereby, is not a ratification of said Exhibit K." And, "that the acceptance by the said Havens of said deeds G and H, and his retaining the title to the lots thereby conveyed, does not render the said Havens personally liable to pay the said Plaintiffs," &c.

We think the Court is here, clearly wrong in the legal conclusion. This we regard as the great and fatal error of the case. We may waive all the errors committed in the rulings upon the testimony, which we have before considered, and take the facts as found by the Court (which are virtually what the pleadings admit,) and the Plaintiffs are entitled to a decree as demanded.

The state of facts, then, presented by the finding of the Court is this: Harriet E. Bishop was empowered by Havens to purchase real estate for him in St. Paul and vicinity. October 14th, 1857, she purchased of Torbett, in Kinney's outlots, lots 8, 9 and 14 for herself, and lots 5, 6 and 7 for Havens. (See Exhibits G and H, attached to complaint.) In consideration whereof, she agreed with Torbett on her own behalf, and also as attorney in fact for Havens, to pay Torbett's note and mortgage, now held by Plaintiffs, which agreement was put in writing, and is designated as Exhibit K. Havens accepted, and received the conveyance of the lots to him, and still holds the title to the same, and has never reconveyed or offered to reconvey the same to Torbett. The legal question then is, (admitting the agent had no original authority to bind Havens to Exhibit K,) does this amount to a ratification of Exhibit K, on the part of Havens, or render him personally liable to pay the said note and mortgage? The Court below holds it does not. This we cannot but regard as a manifest error. We have already discussed this subject pretty fully, as one of the points made, in considering the error of the Court in excluding Exhibit K as evidence, and would, therefore, refer the Court to what we there said, and the authorities cited: and particularly 1 *Parsons on Con.*, 46 *and* 47; 5 *Minn. Rep.*, 339; 1 *Comstock*, 433; 8 *Pick.*, 56; 19 *Pick*, 300; 23 *Vt.*, 565; 13 *N. H.*, 145; 7 *East*, 164.

Torbett has conveyed his property to Havens by warranty deed who accepts and holds the same, but repudiates the consideration. Torbett has got nothing for the conveyance, and is still liable on his note; while Havens has paid nothing, and denies his liability to pay anything, though holding the property, and, if it sells for more than sufficient to satisfy the mortgage, will claim and be entitled

to the surplus; and if it becomes an object to redeem the property at any time within three years from the sale, will claim and have the right and benefit of such redemption. In short he ratifies the act of his agent so far as he may think it beneficial to himself, and undertakes to reject the remainder. This he cannot do. By accepting the benefit accruing from the act of his agent, he is precluded from denying the agent's authority in the premises in any respect. Having ratified and sanctioned the act in part, it is a confirmation of the whole.

Then from the facts as found, the Plaintiffs are entitled to judgment against Havens for any sum remaining due after exhausting the mortgaged property, which judgment may be rendered by this Court, without sending the case back for further proceedings in the Court below.

If Havens is liable upon the agreement evidenced by Exhibit K, Torbett has a right of action against him upon it, as soon as the note is due and not paid, without first taking the same up himself; the agreement being *to pay it.* 2 *Parsons on Con.* 462 *and note;* 1 *Hill.,* 145; 10 *Wend.,* 498; 17 *John.,* 239, 479; 7 *Wend.,* 499; 8 *Wend.,* 452; 15 *Wend.,* 502; 3 *Denio,* 321; 21 *Conn.,* 117.

The agreement being *to pay the note,* founded upon a consideration, the holder of the note may sue the party directly, upon such agreement. In such cases, it is not necessary that the promise be made to the party holding the claim, or that the consideration should move from him, to entitle him to sue upon the agreement. 17 *Mass.,* 400; 1 *Hall,* 247: 11 *Mass.,* 152, *n. a.;* 2 *Met.,* 381; 7 *Cush.,* 337; 1 *John.,* 139; 12 *John.,* 276; 5 *Wend.,* 235; 1 *Sumner,* 378; 3 *Cranch,* 492.

*Third*—The third error we complain of, in the conclusions of law found by the Court, is, in the finding: "That the said indenture marked Exhibit M, does not create an express fund out of which to pay" the plaintiff's claim, "or any part thereof; nor is the said sum, or any part thereof, by the terms and effect of said instrument, or the intention of the parties thereto, charged upon the lands and lots therein described."

To pass upon the correctness of this finding of the Court, it is necessary to examine said Exhibit M, which is attached to the complaint, and from the language used, determine the legal import and effect of the same. We claim that a *trust fund* was created for the express purpose of paying and satisfying this claim of plaintiffs, together with others. This fund, consisting mainly of real estate, is placed in the hands of McConkey and wife, with power to sell, and from the "avails" to pay both, the debts due Havens, and the debts due those holding claims for the balance of the purchase money on the "Conlee and Kinney Lots." This was the *intention*, as clearly expressed in the instrument itself. The language is *direct, peremptory* and *significant*. So the parties to that instrument understood it at the time. The debts ("incumbrances") were "to be paid," before the title of said Havens and Bishop would be unincumbered and perfect to said lots. They were *dealing with the fee simple*—a thing they had no right to meddle with, unless they made good their acts by paying the debt due on it. Both their language and acts admit of no other interpretation. They *intended to pay*. Why else so frequently direct the "payment in satisfaction"? &c. Why employ the terms, "pay," "to be paid," and "in satisfaction"? And above all, why direct "duplicate receipts" to be taken? The Trustees were directed "to pay," not to purchase; to pay and take duplicate receipts; not to purchase and take an article, contract or assignment; and to forward one of the receipts to Havens.

This is only the language of debtor and creditor; and contemplates the creditor, the debtor, the debt, and the act of paying, and is susceptible of no other interpretation. Besides, what did Havens want the duplicate receipts forwarded to him for, unless to show that so much of his indebtedness was cancelled? Suppose Torbett had stood by at the drawing of this document, or for some formal purpose had been made a party to it; would he not have been justified in supposing, that when the other parties admitted there were debts ("encumbrances") "to be paid," before their title would be perfect to these lots—when he saw the

authority to sell, with the direction that the "avails" were to be applied in "payment," &c., and when he saw the further direction that "duplicate receipts" were to be taken, &c. ; when he saw all this, would he not have been justified in supposing that *they were to pay* the creditors mentioned, and no one else, and to pay at all events; not if they chose? The language is too clear to admit of a doubt. This Exhibit M, created a trust, and the Plaintiffs, though ignorant of it at the time, may, now that it has been brought to their knowledge, avail themselves of the benefit of it.

*Fourth*—The fourth error we complain of, in the conclusions of law found by the Court, is, the finding, that the plaintiffs are entitled to have subjected to the payment of their claim "no other or different lots of land," than such as are embraced in the mortgage; and also, in not finding that the plaintiffs are entitled to judgment against said Havens for any deficiency that may remain after selling and applying the proceeds of such lands as are subject to be sold for the satisfaction of their said claim. These propositions, of course, depend upon the determination of the questions hereinbefore considered.

III.—The Court erred in the finding of facts.

*First*—In not finding that Miss Bishop had been in the practice of purchasing real estate for Havens, on credit, and giving his notes therefor, with his knowledge, and without objection on his part.

*Second*—In not finding that Torbett had sold real estate to Havens, through his, Havens' agent, Miss Bishop, on credit, and took the note of Havens therefor, made by said agent, and which was paid by Havens.

*Third*—In finding that Miss Bishop had no other authority to execute Exhibit K, binding Havens, than what is conferred by Exhibit A.

*Fourth*—In finding that the original purchase of the Kinney lots, by Bishop, in February, 1857, was not for and on account of Havens.

IV.—The Court erred in refusing to grant a new trial upon the ground of newly discovered evidence. This newly discovered evidence consists of a letter from the Defendant Havens, to Miss Bishop, dated December 23d, 1857, in which he says: " I notice we are some in debt for the Conlee and seven Out-lots. I do not like to be in debt, and shall be in favor of paying all up within the next six or twelve months—as soon as I can convert my Eastern property and paper to cash. You can no doubt get a handsome discount for pre-payment."

The " seven Out-lots," are the Kinney lots, of course, as there is no other property, in which they were concerned, that will answer the description. This letter shows that he had been fully informed of the agreement to pay the Humphrey claim, and of the time when it would be due. He says, " I notice *we* are some in debt," &c., showing that he understood it was the joint debt of himself and Miss Bishop, as Exhibit K makes it. The Humphrey claim would not be due until some time in 1861, and his letter shows he so understood it; for he says, " I shall be in favor of paying all up within the *next six or twelve months*." " You can no doubt get a handsome discount *for pre-payment*," clearly showing that he had been fully informed of the *agreement to pay*, and of the time when it would be due, and showing his purpose *to pay before* it was due, and " get a handsome discount." This letter convicts Havens of perjury, and settles the question of his personal liability to pay the plaintiffs' claim.

But this evidence was not discovered or known to the plaintiffs until after the trial of the case, and hence the motion for a new trial on the ground of newly discovered evidence. The importance of said evidence seems not to be questioned; but the Court below refused a new trial, on the ground that due diligence had not been shown to procure the evidence at the trial. In this we think the Court erred. It was a private letter from Havens to Miss Bishop, of the existence of which the plaintiffs had no knowledge whatever. Havens had testified that he first heard of this agreement to pay plaintiffs' claim from Torbett, by letter, in November, 1859, and that he never sanctioned, but repudiated

the agreement.   Miss Bishop swore that she did not recollect of informing Havens of the agreement.    With such swearing as this, and the letter in their own possession, and the plaintiffs with no knowledge of its existence, how can it be said that the plaintiffs did not use due diligence to procure it?

The affidavits show how the Plaintiffs got possession of the letter.


Points and authorities of Respondent.

I. *a.*—The testimony of the witnesses, Pond and Torbet, as to the declarations of Miss Bishop, that the Kinney outlots were purchased for Havens, (being the only parts of Pond's and Torbet's testimony that were excluded,) were inadmissible as against Havens, and were properly excluded, because—

1st. If such a secret trust in favor of Havens, as is alleged in the complaint, and was attempted to be proved, existed and was valid, it would not render Havens liable to pay the mortgage debt.    A trustee is not an agent whose acts may be charged directly upon his principal; nor does the rule of charging the unknown principal of an agent dealing in his own name, when discovered, apply to the case of a *cestui que trust* purchasing through a trustee.    The legal title was taken by Torbet alone.    The seller was satisfied to take his obligation secured by the land.    There is no principle known to law or equity, by which the vendor may reach over and charge personally a person having a merely beneficial interest in the land charged with the debt.    And even if a valid trust could be held so as to charge the beneficiary, most certainly a void trust could not.    The statute of uses and trusts makes this alleged trust absolutely void.    *Comp. Stat.*, *p.* 382, *secs.* 1, 7 *and* 8.

Havens, on the facts alleged, could not have enforced any claim against Torbet.    It would be monstrous to hold that he was liable for the purchase money.

2d. The transaction attempted to be shown was unauthorized.

43—vol. ix.

Miss Bishop had no shadow of authority from Havens to enter into any such transaction; she was certainly not authorized to purchase lands for Havens, in the name of another party, nor upon or under any trust, and surely not under a void trust, nor jointly with any other party, and especially not jointly with herself.

3d. The declarations of an agent are admissible to charge the principal only when they form a part of the *res gestæ*, which was not the case with the declarations sought to be proved. They were outside statements made to strangers, before the purchase was made, and not in the presence of the party from whom it was made. Such declarations, to be admissible, must be made *dum fervet opus*, while the act is being performed, and in such a manner as to be interwoven with and form a part of it; and, unless such is the case, their nearness to the act in point of time is immaterial. They are just as inadmissible, if made an hour before, as they would be if made a year before. 4 *Wend.*, *p.* 394 ; 3 *Hill*, 262 ; 1 *Greenleaf's Evidence*, *secs.* 113 *and* 114; *Story on Agency*, *secs.* 134, 35–36–37.

*b.*—The testimony of Mrs. McConkey as to the statements, acts and agreements of Pond, Torbet and herself relative to the purchase of the Kinney lots, was clearly admissible. The witness swears to the details of agreements and transactions between herself, Pond and Torbet, in which all were principals. The evidence was also competent, as contradicting Pond and Torbet on the point of their interest in the property.

*c.*—The two letters from Torbet to Havens, and the letter from Havens to Torbet, marked A, B and C in the printed case, were properly admitted. The letter C, in connection with the others, clearly contradicts and discredits Torbet on the subject of the original purchase of the Kinney lots, and the three letters (comprising all the correspondence on the subject,) were necessary to make that contradiction appear. Indeed, by a familiar rule all the letters must be produced to render any of them admissible. They were also competent to show that Havens immediately repudiated Exhibit K, on being informed of its existence

by Mr. Torbet, and to fix the date of his first knowledge of the existence of said exhibit.

*d.*—The tenth and twelfth interrogatories of Havens' deposition, and the answers thereto were properly admitted.

Their propriety and bearing are illustrated by the fact that the Plaintiffs' counsel make a point that the execution of Exhibit K, (the bond,) was ratified in the execution of Exhibit M. It was certainly competent and material to show that Havens had no knowledge of the existence of the bond at the time Exhibit M was made.

We have noticed above all the exceptions to the reception or rejection of testimony which the Plaintiffs' counsel have deemed worthy of notice in their points served upon us, and we respectfully submi  that no error occurred at the trial in this regard.

II.—The Plaintiffs' counsel make the following rather peculiar points :

" The Court erred in finding as a fact that the original purchase of the Kinney lots by Miss Bishop, in February, 1857, was not made for and on account of P. E. Havens; also in not finding as a fact that Miss Bishop had no authority to bind Havens in the execution of Exhibit K; also, in not finding as a fact that Miss Bishop, under the authority conferred upon her by Exhibit A, had been in the habit of purchasing real estate for Havens on credit, and giving his note for the purchase money, with knowledge and without objection on his part, and that he recognized and paid such notes; also, in not finding as a fact, that before the execution of Exhibit K, Miss Bishop, as such agent for Havens, had purchased from him, Torbet, real estate for him, Havens, on credit, and had given Havens' note for the same, which he paid without objection; also in finding as a fact that Exhibit K had not in any way been ratified by Havens; also in finding that Havens had no knowledge of Exhibit K until October, 1859."

In some of the above points this Court is asked to review the decision of the Court below upon questions of fact, which it has

no power to do; and these points have no force or significance at all unless it is claimed that the findings of the Court below were against the evidence.

But the Plaintiffs are not in a position to raise that question in this case. That could only be done by a motion for a new trial, which has never been made.

In others of the points above quoted it is simply claimed that the Court below erred in not finding facts upon which there was no issue in the pleadings, and which were at best only matters of evidence.

It has frequently been held by this Court that the findings of the Court below on questions of fact will not be disturbed by this Court, when there is any evidence to support them. 7 *Minn.*, 442; 8 *id.*, 70; 8 *id.*, 286; 4 *id.*, 282.

But not only was there evidence to support all the findings in this case, but a clear preponderance of evidence.

On the question for whom the Kinney lots were originally purchased, there was the testimony of Pond and Torbet on one side, and the testimony of Mrs. McConkey on the other, while Torbet was directly contradicted and discredited by his correspondence with Havens, and the whole testimony of both Torbet and Pond was further discredited by the fact which the Court below expressly finds, that Torbet paid from his own funds a part of the purchase money, and was paid by crediting him with a sum of money on account, for his subsequent conveyance of lot 13.

On the question of the authority of Miss Bishop to bind Havens in the execution of Exhibit K, the finding of the Court below is in the following words: 

" I further find that the said Harriet E. had no authority to act as the agent of said Havens, or to make and execute said instrument marked Exhibit K, or any authority except such as was conferred by the letter marked Exhibit A, as aforesaid, and the power of attorney marked Exhibit L, aforesaid."

The Plaintiffs, for the purpose of showing an implied authority from Havens to Miss Bishop, to execute Exhibit K, attempted to

Humphrey et al v. Havens et al.

prove, under the objection of the Defendants' counsel, previous acts of Miss Bishop, of a similar character, which Havens had ratified. Some of the assignments of error above quoted are that the Court did not find in his decision specifically on these matters. It would have been manifestly improper if the Court had done so. There is no issue of that kind in the pleadings. Such facts, if they are admissible at all under the pleadings, are simply matters of evidence bearing upon the main issuable fact, viz. : the authority of Miss Bishop to bind Havens by Exhibit K. And the finding of the Court on this point was clearly correct, and in accordance with the evidence.

The Plaintiffs failed to show one single instance where Miss Bishop attempted to bind Havens to a personal liability except in the execution of Exhibit K. All the evidence offered related to a single case, viz: the purchase of the Washington county land from Torbet. But it is not shown by either Torbet or Mrs. McConkey that she assumed to bind Havens by any note. Both say they cannot testify whether she signed the note in his name or not, and the burden of proof was on the Plaintiffs ; and in the letter of Miss Bishop introduced to show notice to Havens, there is nothing to charge him with such notice. On the contrary, the clear inference from that letter is that Miss Bishop and Torbet both considered it as her affair and not Havens'. Besides, Miss Bishop swears that she paid the note on the first of January, 1857, or within a day or two thereafter, and this letter was dated December 27, 1856. Havens could not have received it even when she made the payment. The only ground on which evidence of such implied authority ever proceeds is, that the principal, by performing the contract of his agent, admits to the party with whom the agent has so dealt, the right of the agent so to deal in his name; and this implied authority is only recognized as existing by the *usual practice* of the agent with the knowledge of his principal. *Story on Agency*, secs. 55, 56.

And this approval or assent of the principal must be *brought* home to the knowledge of the party dealing with the agent.

In this case there was but a single transaction attempted to be

proved, and the proof of that failed in every essential particular
It was not shown that it was a note signed in Havens' name; the
note was paid by the agent without the knowledge of Havens;
there is not a particle of evidence of ratification or assent by the
principal, and not a particle of evidence of such assent ever being
brought to the knowledge of the dealer, Torbet; the transaction
was separated from that now in question by a long interval of
time,—was made under widely different circumstances,—was of
an entirely different nature; and, in short, there was absolutely
nothing from which Torbet had a right to infer or could infer au-
thority in the agent to execute Exhibit K. Admitting that this
evidence is properly in the case, it is respectfully submitted that
it is impossible for this court to say that the finding of the court
below, that Miss Bishop had no authority to execute the bond
except the letter A, is not in accordance with the evidence and
correct.

But the evidence was improperly admitted, and was received
subject to the objection of the Defendants. The only allegation
of authority in the complaint is that Miss Bishop was appointed
agent to do certain things by letter A. If the letter does not
confer any authority, then the Plaintiffs are in the same position
as though they had not alleged any authority at all.

The bond was executed on the part of Havens by Miss Bishop
as his attorney in fact, as appears by Exhibit K, and when the
pleading discloses that an act was done through an agent, the rule
is, that authority to do the act must also be pleaded. The letter
being the only authority pleaded, the Plaintiffs must stand or fall
by it. *Abbott's Pleadings* 123, *note and cases cited.*

The finding of the Court below as a conclusion of fact, that
" Havens has never ratified the act of the said Harriet E. in exe-
cuting said instrument, in any manner whatever, unless the taking
of the deeds marked Exhibits F and H, and the retaining the title
to the lots thereby conveyed, constituted ratification," is in strict
accordance with all the testimony in the case.

Ratification of an unauthorized act of an agent can never be
binding unless it is made with full knowledge of all the material

facts and circumstances, by the principal. *Hays vs. Stone*, 6 *Hill.* 128; *Copeland vs. Mer. Ins. Co.*, 6 *Pick.*, 203; *Owing vs. Hall*, 9 *Peters*, 629; *Bryant vs. Moore*, 13 *Shepley*, 84.

The evidence shows conclusively that Havens had no knowledge or intimation of the existence of the bond till November 9, 1859, long after the execution of Exhibit M, and he repudiated it immediately on its being brought to his knowledge (see Havens' letter to Torbet marked B).

Mrs. McConkey swears that she has no recollection of informing Havens of the existence of the bond. Indeed there is no conflict of testimony on the point.

III.—Having noticed all the points raised by the Plaintiffs' counsel with reference to the correctness of the finding of facts by the Court below, it only remains to consider whether the conclusions of law found are supported by such facts; and

First—The taking by Havens of a conveyance of part of the lots from Torbet does not of itself raise a personal obligation or liability on his part to pay the mortgage debt or any part of it.— 22 *N. Y.* 438.

The authorities cited by the Plaintiffs' counsel go to this extent, that where the simple equity of redemption in mortgaged premises is sold and conveyed, the land is the primary fund for the payment of the mortgage debt, but none of the cases hold, nor can, as we believe, any respectable authority be produced, holding that the grantee of the equity of redemption is liable for any deficiency that may remain after exhausting the mortgaged premises, unless he has expressly agreed to pay the mortgage debt.

Second. The letter A annexed to the complaint, conferred upon Miss Bishop no authority to bind Havens in the execution of Exhibit K, and the same is void as to him; this letter only conferred upon Miss Bishop power to invest in the purchase of real estate, or to loan for Havens the moneys actually received by her for such purpose, being more or less, according as Havens chose to send. It neither expressly or impliedly gives Miss Bishop any authority to purchase lands for Havens on credit, nor to run Ha-

vens in debt, or contract any liabilities in his name, except perhaps for the expense of counsel, and of agents in looking up lands to purchase, and the personal services of Miss Bishop. The general statements in the letter, such as " do as you would for yourself," only give Miss Bishop a wide discretion within the scope of the authority actually and specifically conferred, and do not enlarge it. 8 *Wend.*, 495.

Third. The retaining by Havens of the lots conveyed to him is not a ratification of Exhibit K, and does not bind Havens to pay the Plaintiffs' claim.

That is a matter with which the Plaintiffs in this suit have nothing to do ; they are entire strangers to that transaction. The conveyance to Havens in no respect injured their rights, nor would a re-conveyance to Torbet improve them.

The doctrine that a principal, by receiving the benefit of an un- authorized act of his agent, ratifies the act, has no application to this case. The Plaintiffs are not in a position to raise any such question. It is only the party who has lost the benefit which the principal has received by reason of the unauthorized act, that has a right to complain of the non-returning of the benefit. Here the Plaintiffs have lost nothing by Havens retaining the equity of redemption of these lots, nor indeed has any one else, as will be seen hereafter. It is a matter between Torbet and Havens alone, which cannot be enquired into in this suit.

But even as between Torbet and Havens, the retaining by Havens of the equity of redemption, would not render the latter liable on the bond.

If the circumstances of the case were such as to make it of any importance to re-convey, Havens, in case he was sued by Torbet on the bond, could come in, and in his answer set up the want of authority in Miss Bishop to execute the bond, and at the same time offer to re-convey the lots, which would be a perfect defence. But such an offer could not be made in this suit ; such an issue is only proper in a suit between Torbet and Havens.

But this is not one of those cases where, as between Torbet and Havens, a re-conveyance is necessary to avoid liability on the bond

or is of any importance whatever.    Havens has derived no bene-
fit from retaining the equity of redemption, nor has Torbet sus-
tained any injury.    The equity of redemption was of no value.
Torbet parted with it for the only consideration that he should be
indemnified against the mortgage debt for any deficiency of which,
after exhausting the mortgaged premises, he was equally liable,
whether he continued to hold the equity of redemption or not, and
whether Exhibit K was valid or not.    It is admitted by all par-
ties that the Plaintiffs' mortgage far exceeds the value of the lots;
indeed the whole controversy is as to who shall pay the deficiency.
A re-conveyance could be of no possible advantage to Torbet, and
he has never asked it as the Court finds.    Havens' first knowledge
of the existence of the bond was derived from Torbet's letter
of October 31, 1859, and he of course had no occasion to re-
convey before that time.    In his answer to that letter, Havens
expressly repudiates the bond, but Torbet, in his reply does not
ask a re-conveyance, or intimate that he would accept one, but
complains that he is liable to a judgment for the deficiency, a
clear intimation that he did not desire a re-conveyance.   The ex-
pense of a re-conveyance would have been money thrown away,
and there is no principle known to law or equity which compels a
man to do a vain or useless thing.

It would be monstrous to hold that Havens is liable to pay a
large sum of money to the Plaintiffs because he has not re-con-
veyed to Torbet (a stranger) a nominal interest in real estate
which is admitted to have no value whatever, and which re-con-
veyance Torbet has never, in fact, desired.

If it was necessary to pursue this subject any further, there is
another good and sufficient excuse in the law for not re-convey-
ing, and that is, that Havens, before he knew of the existence of
the bond, had put it out of his power to re-convey a clear title, by
reason of the complications growing out of the agreement with
Mr. and Mrs. M'Conkey, of Oct. 2, 1858.    13 *Shipley*, 84.

Fourth.    The Court below held correctly that Exhibit M does
not create a trust or fund for the payment of the Plaintiffs'
claim, and that such claim is not, or any part thereof, by the

terms and effect of said instrument, or the intention of the par-
ties thereto, charged upon the lands therein described.

If a trust is created, who is the trustee ? Not Havens, certain-
ly, for there is nothing in the instrument which shows, by impli-
cation even, that he became seized of the lands for the benefit of
the Plaintiffs ; nor the M'Conkeys, because the title to the lands is
not in them.

It is necessary, in the creation of a trust proper, that the legal
title of the trust property should be vested in the trustee. *Wil-
lard's Equity Jurisprudence, p.* 186.

And who is the beneficiary, the Plaintiffs, the owner of the
incumbrance on the Conlee lot, or Havens ?

The only thing in the instrument that has the remotest resem-
blance to a trust in favor of the Plaintiffs, is that a power of sale,
with certain restrictions, was bestowed on the McConkeys, and
in case of its exercise, an option was given them to apply the
avails to pay off the Plaintiffs' mortgage.

This, if in the nature of a trust at all, is a power in trust, but to
say that it is such a power as the Plaintiffs in this suit can enforce
for their benefit, is a proposition which seems to us too palpably
absurd to be insisted on.

In the first place, Havens expressly reserved the right to con-
trol the exercise of the power by a provision in the instrument,
that he should be consulted and his advice followed ; and also,
if he chose, to recall the power entirely, and make conveyances
himself.

In the second place, aside from any interference from Havens,
the exercise of the power is expressly made to depend upon the
will of the grantees of the power. It is left to their option
whether they shall sell any portions, and if so, what portions of
the property.

And in the third place, in case they do exercise the power, it
is entirely optional with them whether the avails shall be paid to
Havens to apply on their indebtedness to him, or shall be applied
to the payment of the incumbrance on the Kinney lots, or the in-
cumbrance on the Conlee lot.

It is well settled, that the Court will never compel the exercise of a discretionary power whether in trust or not. *Story's Equity Jurisprudence*, sec. 1070 ; *Hill on Trustees*, p. 488 ; 5 *Howard U. S.*, 233 ; 5 *Barb.*, 613.

But the instrument does not show an intention to create a trust in favor of the Plaintiffs, and it is a familiar rule that the intent is to govern in such case.  10 *Johnson*, 495.

The instrument discloses no possible motive or inducement for Havens or the McConkeys to set apart a large amount of real estate, in addition to the mortgaged premises for the payment of the Plaintiffs' claim.  It discloses no consideration of equity for such a course.  The mortgagee, after having received $1,750 of cash of the purchase price of the lots, was content to take the mortgage as security for the balance.  Neither the mortgagee nor the Plaintiffs had any part in the execution of Exhibit M.  It did not affect their rights in the least, and was not intended either to injure or benefit them.

It is evident, from the whole tenor and scope of the instrument, that it was entered into by the parties thereto, with a view to their own exclusive benefit.  Havens' object was to recover back his funds, which had been fraudulently used, and a part unaccounted for, and Mrs. M'Conkey's object was to account for the funds, and mismanagement thereof, and secure Havens.  The securing to the Plaintiffs of their debt, formed no part of the objects sought to be accomplished by the instrument.  Havens did not at that time know that there was any pretence of a personal liability on his part for the payment of the incumbrances on the Kinney lots, and the Conlee lot.  Indeed there never was any such pretence with reference to the latter.  Any expectation the parties then had of paying these incumbrances, was with a view of protecting their interest in the property, as is clearly expressed in the instrument, and was entertained in view of the possibility that the lands might be worth more than the mortgaged debt, an opinion which, if they entertained, they had a right to modify or change at any moment, and act accordingly, without giving rise to any cause of complaint on the part of the Plaintiffs.  Indeed

by the very terms of the instrument it is left undecided and op-
tional, whether those incumbrances were to be paid or not, and
the Court cannot compel them to elect contrary to their inclina-
tions, especially in favor of a party who has not the slightest
equity in the world.

The power of the Court, in reference to trusts, is only to be ex-
ercised in accordance with the requirements of equity and good
conscience, and only in favor of a party whose rights are clearly
defined and certain, and who is clearly and equitably entitled to
the aid of the Court.

And considering the whole case in one view, it is respectfully
submitted that the ends of justice and equity are exactly answer-
ed by enforcing the securities which the Plaintiffs themselves ac-
tually took and required for the payment of their claim, that is by
a decree of foreclosure of their mortgage, and a judgment against
the parties to the note for the deficiency.

Such being the judgment below, it should be affirmed by this
Court.

Points and authorities of Respondents upon the appeal from
order denying motion for new trial.

The order denying the motion of the Appellants for a new trial
was properly and correctly made, for the following reasons :

*First.*—It is not shown in the moving papers that the letters
alleged to have been discovered, were ever sent by Havens to
Miss Bishop—the letters having been obtained from the possession
of Mrs. McConkey, (formerly Miss Bishop,) or her husband, and
being addressed to her, the Appellants should have produced her
affidavit, *i. e.* the affidavit of the party from whom the evidence
comes, showing the receipt of the letters by her, from Mr. Ha-
vens, and especially is this the case when the manner in which
the letters were obtained by the Appellants, as stated in Humph-
rey's affidavit, is calculated to throw suspicion upon them. 8 *Min.*,
225 ; 6 *Ib.* 513.

*Second.*—The evidence alleged to be discovered is immaterial.
There were but two main questions of fact litigated in the case;

one as to whether the original purchase of the Kinney lots was in the interest of Havens, as a matter of fact, aside from any question of authority, and the other as to the authority of Miss Bishop to execute Exhibit K, the bond.    These letters most certainly throw no light upon the first question, and it is only necessary to consider their bearing upon the second one.    And 1st, as to letter "A," in the moving papers; this letter confers no additional authority to letter A of the complaint, so far as running Havens in debt is concerned.    The only additional power conferred upon Miss Bishop, is to take conveyance to *herself*, immediately re-conveying to Havens, and to exchange property—wholly immaterial matters.    The general language, " do as you choose," is subject to the same construction as similar clauses in letter A of the complaint, *i. e.* it was intended to give her full discretion, within the authority actually conferred upon her, but not to enlarge it.    2d, as to letter " B;" this letter is dated after Exhibit K, and can be of no avail, unless to show a ratification of the act of Miss Bishop in making that instrument.    But there is no allegation in the complaint, under which evidence of ratification can be received.    The allegation of the complaint is, that Miss Bishop's authority was conferred upon her by letter A of the complaint, and there is no allegation of any other authority or of ratification; and aside from the question of pleading, the evidence has no value, because it throws no light upon the question of the knowledge of Havens of the existence of the bond, or of any attempt upon the part of Miss Bishop to make him personally liable for the mortgage debt; it fails to prove the main element of ratification, *knowledge.*— There is nothing better settled than that ratification must be with a full knowledge of all the material facts and circumstances, and must be unequivocal in its character.    6 *Hill.* 128; 6 *Pick.*, 203; 9 *Peters'* *S. C. R.* 629; 4 *Selden*, 401.

There is nothing said in this letter about a bond, and it only shows that Havens knew at that time that the Kinney Lots and Conlee lot were subject to incumbrances which it would be necessary to pay before their title would be perfect and secure.    That this is what he meant, and was the extent of his knowledge on

the subject is perfectly obvious from the fact that the "Conlee lot" is included in the same statement, and there is no pretence by any body that Havens was personally bound to pay the mortgage on that lot; besides, this letter is predicated upon a statement received from Miss Bishop, and she has testified as to what that statement contained; she testified in substance that she thinks she informed Havens of the conveyance to him, but does not think she gave him a full statement of the purchase of the Kinney lots; she had received from him a blank statement, which she filled up, but thinks there was no statement of the circumstances attending the purchase, nor has she any recollection of informing Havens of the bond of indemnity. In fact there is nothing more contained in this letter than in the recitals of Exhibit M, of the complaint executed under Havens' hand and seal; it is expressed there in a legal instrument in terms more definite and certain than the loose style of letter writing, and is as follows:

" And there are incumbrances upon the said Conlee and Kinney lots amounting to between four and five thousand dollars, to be paid before the title of said Havens and Bishop will be unincumbered and perfect to said lots."

Exhibit M is admitted by the pleadings, and this letter, containing no additional evidence or admission, is wholly immaterial. As to materiality, see 1 *Graham & Waterman on New Trials*, *pp*. 463, 4–5 ; *also* 10 *Wend.*, 286.

Third. The evidence alleged to be discovered is cumulative; it relates to the main question contested in the case, *i. e.*, the authority of Miss Bishop to execute Exhibit K, and it is precisely the same kind of testimony used by the appellants on the trial. They then relied upon Exhibits A and M of the complaint, as evidence of authority; other letters are now produced of the same character, and going to the same extent and no further. Their discovery clearly furnishes no ground for a new trial, especially as Exhibits A and M were admitted to be genuine. See 10 *Wend.*, 286 ; 7 *Barb.*, 271 ; 1 *Sandf.*, 195 ; 8 *Abbott's Pr.*, 310 ; 5 *Minn.*, 171 ; 4 *Minn.*, 438.

Fourth. If it should be considered that the evidence discover-

ed is material and not cumulative, it is not of sufficient weight or importance to change the result.

Havens expressly swears that he had no knowledge of the existence of the bond until November 9th, 1859, when he first learned it by letter from Torbet, which statement the correspondence between him and Torbet fully bears out.

Mrs McConkey swears that she did not inform Havens of the existence of the bond in the statement on which the letter B, alleged to be discovered, is based. If this letter should be regarded as of any weight or consequence at all, as tending to show ratifi- ·cation, it is respectfully submitted that it is of such doubtful character and of so little real value, that it could not by any possibility change the result. Ratification must be certain and unequivocal in its character. This letter furnishes at best a very doubtful inference, and in opposition to that inference is the posi-·' tive testimony of Havens, Mrs. McConkey, and many surrounding circumstances, in themselves of more value than this letter; such as the correspondence with Torbet, and ʳthe recitals in Exhibit M.

Where a new trial is not likely to change the result, it will not be awarded. 1 *Graham & Waterman on New Trials, pp.* 465 *and* 492; 3 *Id., pp.* 1021, 1043 *and* 5, *and* 1093 ; 5 *Minn.,* 171.

Fifth. A party applying for a new trial on the ground of newly-discovered evidence, must show diligence. He must make it appear affirmatively, not only that he has discovered the new evidence since the trial, but that he could not by the use of diligence have discovered it before; and if the new evidence comes from a witness who was examined on the trial, it is conclusive of negligence. See 1 *Graham & Waterman on New Trials, p.* 472; 3 *Id., pp.* 1026, 1029, 1095 & 1096; 8 *Minn.,* 140 ; 8 *Abbott's Pr.,* 310 ; 10 *Wend.,* 286.

In this case, instead of diligence, the grossest negligence appears on the part of the Appellants.

These letters, as stated in Mr. Humphrey's affidavit, were procured from John McConkey, the husband of Harriet E. Bishop McConkey, to whom they were addressed, and from whose pos-

session they of course came.   The Appellants and their attorney well knew that the business transactions between Mr. Havens and Miss Bishop were carried on by letters, as sufficiently appears from the complaint, and the notice to Mr. Havens to produce Miss Bishop's letters as well as his own, addressed to her.   From the very fact of such notice being given, it is obvious that the Appellants did know before the trial of this action that such letters had been written, and that they deemed them important.

The Appellants must have known that Mrs McConkey and Mr. Havens were the only proper and obvious sources of testimony, on this question of authority, and that Mrs. McConkey was far the most obvious source of the two.   Common prudence, to say nothing of diligence, should have induced them to apply to Mrs. McConkey, for the letters she had received from Mr. Havens, or for her authority to act for Mr. Havens, in whatever form it might be ; yet, notwithstanding her residence in St. Paul, where she was perfectly accessible to the Appellants and their attorneys, it does not appear that they ever made an enquiry of her on the subject of her authority, or asked her to produce her letters, received from Mr. Havens, they at the same time, well knowing that she was the proper person to look to for such letters, and being aware of their existence.   It is a clear mistake and evasion to say that they have discovered letters since the trial, when they gave notice to produce the very letters.   If they had applied to Mrs. McConkey who had the letters, and who they knew, or ought to have known, had the letters, they being addressed and sent to her, they would have obtained them.   Instead of that they contented themselves with serving upon Mr. Havens a notice to produce letters from himself to Miss Bishop, which were not in his possession in fact, and could not be expected to be.   In addition to all this, the Appellants called Mrs. McConkey as a witness upon the stand, and after they were through with her examination, the Respondents made her their witness ; yet the Appellants did not, while she was their witness, nor upon cross-examination, when she was made the witness of the Respondents, ask her a single question as to those letters ; and this, too, when they knew the letters ex-

isted, and that she was the only proper and natural repository of them. A question propounded to her would have elicited the evidence pretended to be discovered. Could gross negligence be rendered more apparent ?

It is incumbent on the moving party, in applications like this to show a want of diligence. Every presumption is against the moving party ; but instead of diligence appearing affirmatively in this case, it clearly appears that the Appellants have been guilty of the grossest negligence. If this application should be granted it is difficult to see why a new trial could not be obtained in any case by omitting to search for testimony, the existence and source of which was known or suspected, or by omitting to question a witness when on the stand, to a material matter.

It is respectfully submitted that the Appellants have not, for the reasons above stated, brought themselves within the well-established principles which govern applications of this kind, and that the order of the Court below, denying a new trial, was clearly correct, and should be affirmed.

SMITH & GILMAN, Counsel for Appellants.

HENRY HALE and GREENLEAF CLARK, Counsel for Respondents.

*By the Court*—EMMETT, C. J.—There appear to be three distinct cases on the calendar at this term, between these same parties, all, however, arising out of the single action heard and decided in the Court below, and which are accounted for as follows: It appears that the Plaintiffs first appealed from the judgment or decree rendered against them ; but subsequently claiming to have discovered new evidence material to the issues, they moved on that ground for a new trial, and, the motion being denied, they again

45—vol. ix.

appealed from the order denying the same. Afterwards, it being found that the appeal from the judgment or decree was not within six months from the time the decision therein was actually rendered, although within six months from the time of entering the same on the record, the Plaintiffs sued out their writ of error, (the same being within time,) expecting thereby to take advantage of errors occurring at the trial, should their said appeal be dismissed.

The Defendants now move, first to dismiss the writ of error, because of the existence of the two appeals—next, to dismiss the appeal from the order denying a new trial; because, as it is claimed, every error therein alleged is included in and can be considered in disposing of the appeal from the judgment; and, lastly, they move to dismiss the last-mentioned appeal, because of the lapse of time, as before noted.

We will consider these several motions in the order of time in which the proceedings occurred to which they severally relate—and, first of the appeal from the judgment.

The motion to dismiss this appeal is no doubt predicated upon the decision of this Court in *Griffin vs. Furlong*, 3 *Minn.*, 207, where it was held that the year within which a writ of error must be issued, commences to run from the time of making the decision by which the rights of the parties are determined and adjudged, and not from the time when such judgment is perfected by being entered of record. We have, however reluctantly, come to the conclusion that we ought not to follow this decision. We believe that the interpretation therein given to the statute is not in accordance with the spirit, however it may agree with the letter of the law, and that to date the time for a writ of error, or appeal from the actual entry of the judgment or order from which it may be taken, is more in consonance with the old practice, and the practice of the courts in other states, and that it avoids all perplexing questions as to the precise time when a decision or order is actually determined on, by establishing what may be termed an initial point, which is certain and can never lead astray. The question, we may also observe, is one of mere practice, involving no principle, and we make the change as much for conve-

Humphrey et al. v. Havens et al.

nience in the practice as anything else, and with the less hesitation because the decision referred to was not made by a full bench.

The motion to dismiss the appeal from the judgment, is, therefore denied.

The appeal from the order denying a new trial is not, in our opinion, liable to the objection urged against it on the motion to dismiss. On an appeal from a judgment nothing is reviewed which took place subsequent to the entry of the judgment; while a motion for a new trial, although it may embrace all the alleged errors up to that time, may, nevertheless be, and in this very case actually was predicated wholly upon matters which have no place in the record previous to the judgment. In order, therefore, for a party to avail himself of any error of the judge in deciding a motion for a new trial, founded wholly on matters subsequent to the judgment, he must of necessity take a distinct appeal from such decision, and on the hearing he would probably be confined solely to such matters as were brought to the notice of the judge on the hearing of said motion.

The motion to dismiss this appeal must also be denied.

But in regard to dismissing the writ of error, we think the motion should prevail; because the Plaintiffs having perfected an appeal from the judgment, as hereinbefore decided, can have all questions heard and decided, upon the hearing thereof, which could be considered and determined on writ of error; and the statute does not contemplate that the concurrent remedies, by writ of error and appeal from the judgment, shall both be pursued at the same time, nor that one may follow after a hearing and determination on the other.

It will be perceived that the foregoing disposition of the several motions to dismiss, leaves the appeal from the judgment and the appeal from the order denying a new trial still pending. We shall confine ourselves to the consideration of the latter, and will refer to the record of the trial and proceedings prior to the judgment, so far only as may be necessary to show the bearing and materiality of the questions on the motion for a new trial.

The main object of the action commenced by the Plaintiffs was to hold the Defendant, Palmer E. Havens, to the performance of a certain agreement under seal, dated October 14, 1857, (designated in the case made as exhibit "K,") and signed by the Defendant, Harriet E. McConkey, (then Harriet E. Bishop,) and the said Palmer E. Havens, by the said Harriet, as his attorney in fact. By this agreement the said Harriet and the said Palmer, in consideration of certain deeds of lots (known as the Kinney and Conlee lots,) made to them by one Andrew M. Torbet, had agreed to take the place of said Torbet, and pay a certain promissory note and take up a certain mortgage on the real property conveyed to them by said deeds.

The said Palmer insisted, in his defence, that the said Harriet was not authorized to make any such agreement for him; and, on the other hand, the Plaintiffs contended, that whether or not such authority was originally given, the said Palmer had since fully ratified the act of said Harriet in his behalf. On the trial in the court below, the Plaintiffs, in order to show such ratification, gave in evidence a certain agreement, between the said Palmer on the one part, and the said Harriet and her husband of the other part, dated Oct. 2, 1858, (known in the case as Exhibit M,) wherein the several purchases, loans, etc., made by the said Harriet as the agent of the said Palmer were recited, including the purchase of the said Kinney and Conlee lots, referred to in said agreement marked Exhibit K, and in which the encumbrances thereon before mentioned were referred to, and certain provision made for their payment. To rebut this evidence, or the inference which the Plaintiffs claimed to arise from it, the said Palmer introduced the testimony of said Harriet, wherein she swore that although she had at the time by letter informed the said Palmer, who was then residing in Essex, New York, of the conveyances to him and to her, of the said lots, and of the amount supposed to be paid therefor, she did not think she gave him a full statement of the purchase and the circumstances attending it, and that she had no recollection of mentioning to him the said agreement of indemnity (Exhibit K,) at the time the said agreement marked Exhibit M

was executed, or of ever informing him of such agreement. He also, for the same purpose, gave in evidence his own deposition wherein he testified that he had never heard of said agreement of indemnity until some time in the month of November, 1859, when he was informed thereof by a letter from Torbet, to whom the indemnity was given.

He also gave in evidence his reply to said letter, wherein he had so stated his ignorance of said agreement, and repudiated the act of said Harriet on the premises.

The Court, to whom the issues were submitted, found for the Defendants, and the Plaintiffs appealed, as before stated.

Afterwards the Plaintiffs made a motion for a new trial, on the ground of certain newly-discovered evidence, which they produced on the hearing, in the shape of two letters from the said. Palmer to the said Harriet, one of which was dated February 6, 1857, and the other December 23, 1857.   In that of February 6, 1857, the following passages occur, to wit :

" Yours of the 22d ult., enclosing deed of five acres is at hand. *   *   * I am so busy that I have but a moment's time to write.   It is just as well for you to receive conveyances to *yourself*, and then immediately re-convey to me.   In a few days I shall send you a full power of attorney to sell and convey for me.   *   * You can trade and exchange property, *and do as you choose*, writing me often and minutely of your doings." *   *

The letter of Dec. 27, 1857, contains the following :

" I have to-day examined your statements to me.   All seems intelligible except your entry relative to Allen's addition to Dunnville, Wisconsin.   You say ' purchase price $1,200, paid down $1,200, now due, $300," and in your condensed statement you note $100 invested in this purchase. *I notice we are some in debt for the ' Conlee and 7 out-lots.'* I do not like to be in debt, and shall be in favor of paying all up within the next six or twelve months, as soon as I convert my eastern property and paper to cash.   You can, no doubt, get a handsome discount for prepayment." *   *   *   *   *   *   *   *   *   *

It will be observed that one of these letters is dated some

months prior to the making of the contract of indemnity, and the other some time afterwards, but long before the execution of the agreement between the said Palmer, and the said Harriet and her husband, marked Exhibit M, and before referred to, in which the incumbrance on these lots is mentioned and provision made for removing it as before stated.

We cannot, therefore, resist the conclusion, that, had these letters been produced at the trial, they would not only have aided materially in the determination of the important question of ratification of the act of said Harriet, in executing the agreement of indemnity (Exhibit K,) on behalf of said Palmer, but would have thrown some light on the question of her original authority. The Judge of the court below did not, however, pass upon the question of materiality, but, as we learn from the brief opinion filed, confined his decision solely to the ground that the affidavit used on the hearing of the motion, disclosed no diligence on the part of the Plaintiffs to obtain such evidence at the trial.

This affidavit shows that the Plaintiffs were entirely ignorant of the existence of these letters until some time after the trial— that the knowledge thereof was then communicated to them by the husband of the said Harriet, one of the Defendants, who had obtained possession of them; and that he would not even then consent to their being used by the Plaintiffs, until after they had paid him a consideration therefor in money. It also shows that previous to the trial the Plaintiffs had served a notice on the attorneys of said Palmer for the production of all correspondence between him and the said Harriet, and that no correspondence was produced.

We are of opinion that the giving of this notice was all that the Plaintiffs could reasonably have been expected to do under the circumstances, and that the failure of the Defendants to produce any correspondence in response to such notice would justify the Plaintiffs in assuming that no letters had passed on the subject. But this is not all. The said Palmer had denied all knowledge of the transaction up to a certain specified time, and his deposition was on file previous to the trial, in which be had most un-

equivocally asserted his entire ignorance of the existence of the agreement of indemnity to which said Harriet had signed his name.

The Defendants contend, however, that having called for a correspondence, the Plaintiffs are presumed to have known of its existence, and were guilty of negligence in not eliciting the fact by a cross-examination of the said Harriet, while she was on the stand as a witness.

There is some force in this position, in view of the general terms sometimes used by Courts in endeavoring to lay down a general rule on the subject, but it is not easy to lay down a rule that is inflexible; and although a certain degree of diligence is always required in these cases, yet the same strictness should not be insisted on, when the party objecting is himself responsible to any extent for the failure of the other to discover or produce the evidence on which the motion for a new trial is founded.   In this instance, the Plaintiffs having demanded all correspondence, might be presumed to have some suspicion or intimation that a correspondence existed, but nothing further.   But when the Defendants failed to produce a correspondence, and the said Palmer had sworn that he knew nothing of the transaction to which it related, the Plaintiffs might well indulge the belief that none such existed.   And in addition to this the Defendant Harriet, the person to whom the letters were addressed, stated, in her testimony, that she did not think she had ever informed the said Palmer of the agreement of indemnity to which she had signed his name; and as she appears from her testimony to be an intelligent and truthful witness, the plaintiffs were naturally led to the conclusion that there could have been no correspondence on the subject. No one certainly should be held guilty of negligence, for not discovering, despite these several denials, that the said Palmer had previously written letters such as these, and that they were then in the possession of the said Harriet or her husband.   The Plaintiffs had a right to expect that all correspondence between the said Palmer and the said Harriet relating to the purchase of the lots in question, would be produced on the trial, and the failure of the

Defendants to produce any such correspondence, coupled with the testimony of the Defendants Palmer and Harriet before referred to, excuses the Plaintiffs for a failure to elicit the fact of the existence of such correspondence on cross examination. We are therefore of opinion that the Court below erred in refusing the plaintiffs a new trial. And this conclusion renders it unnecessary to consider the errors assigned on the appeal from the judgment.

The order denying a new trial is reversed, and a new trial awarded.